First District Appellate Court, Second Division, calling the case of Grassroots Collaborative and Raise Your Hand for Illinois Public Education vs. the City of Chicago, case number 1-19-2099. Your panel today is me, Justice Terry Lavin, along with Justice Aurelia Puchinski and Justice Cynthia Cabbs, who is unable to be with us today, but who will watch the Zoom argument and is fully, will be fully prepared and involved in the decision of this case. So who is arguing today for both sides? Please identify yourselves. Good morning, Your Honors. Anil Chivani on behalf of the Plaintiff's Appellants.  And for the City? Elizabeth Tischer for the City of Chicago. Okay. Those are both the names from the briefs, so we're familiar. The way we're doing things, if you haven't been in front of us on Zoom, is sort of simple. We've decided that the first 10 minutes of each party's argument will be uninterrupted, okay, to give you a full opportunity to present your argument. And then we might have questions after that, usually about five minutes of that. And the Plaintiff's Appellant should count on about five minutes for rebuttal. If however, we unduly burden you with questions and cut into your time, we'll be a little more flexible. There's not a case after yours. But generally speaking, it's 15 minutes a side. So let's hear from the Plaintiff, Mr. Chivani, first. Thank you. And good morning, Your Honors. Good morning, Council. And may it please the Court. Again, my name is Anil Chivani. I represent the Plaintiffs and Appellants here, Grassroots Collaborative, and Raise Your Hand for Illinois Public Education. Excuse me, Mr. Chivani, could you speak up a little bit, please, or turn up your volume? Oh, sure. My apologies. Thank you. Is this better? Okay. The complaint filed by the Plaintiffs in this case is a challenge to the City's Administration of Tax Increment Financing, or TIF. TIF is a distinct type of economic development program. It's quite different than other types of programs that are part of the City's general budgeting allocation process. It's distinct because it generates revenue by diverting funds away from the general tax base and then uses those to support development in specific designated districts. But diverting money away from the general tax base and away from support for schools or public taxing bodies is significant and potentially harmful. And so, TIF can only be used when the districts meet very specific statutory requirements, including evidence of blight and the inability to attract private development. And I share this because it is this distinct nature of the TIF program and how it is funded that makes the City's unlawful use of the program so directly harmful to these specific plaintiff organizations. And I'd like to share a little bit about these organizations. Raise Your Hand for Illinois Publication, for Illinois Public Education, works to engage, inform, and empower parents to protect and strengthen public education. It has a number of different programs it supports, including special education services, proper school governance, and improving school facilities. So when TIF improperly makes general tax dollars unavailable to support the school district budget, Raise Your Hand's mission-driven work is frustrated and hindered. Grassroots Collaborative brings together organizations to promote economic development and build powerful working families. Its work includes organizing efforts around raising the minimum wage and many different types of training for community groups. But when the misuse of TIF supports billion-dollar subsidies in wealthy areas like Lincoln Yards that don't meet the legal qualifications, and again, when those subsidies are pulled or diverted from the general tax base, then the efforts of Grassroots Collaborative are greatly hindered. So the harm to these two particular organizations results from these unique features of the TIF program. It's harm that is distinct and palpable and is traceable to the city's actions and therefore provides these organizations withstanding in this case. On this appeal, we are asking the court to do three things. We're asking you to apply existing Illinois standing law. We're asking you to apply it liberally. And we're asking you to look to federal courts for guidance when necessary. And we believe in doing these three things, the plaintiff's complaint here includes more than sufficient allegations to support their standing, and they should be afforded an opportunity to proceed and present their claims on the merits. Illinois standing law is well settled. It requires the presence of a distinct and palpable injury, fairly traceable to the defendant's actions, and substantially likely to be prevented or addressed by the grant of requested relief. In consistent with Illinois law, we're asking this court to apply the test liberally and with a favoring access to the courts. And the liberal approach is appropriate for three reasons. So first, under Illinois law, the defendant has the burden to demonstrate a lack of standing. In other words, a plaintiff is presumed to have standing unless shown otherwise. Secondly, at the pleading stage and facing a 216-19 motion to dismiss, the court must construe the inquiry in favor of the plaintiffs, assessing whether there is any set of facts or reasonable inferences that would, when viewed in light most favorable to the plaintiff, would demonstrate that injury. And third, the liberal approach is appropriate here and is guided by the Illinois Supreme Court in advising that Illinois state standards are even more liberal than federal courts and are intended to encourage greater access to the courts. And that's from the Illinois Supreme Court's 1988 Greer decision. So, looking to federal guidance is particularly helpful in this case because we have organizations that are pleading a direct injury to themselves. And of course, the seminal case on assessing organizational injury is the U.S. Supreme Court's 1982 decision in Havens Realty Corporation v. Coleman. And briefly, Havens involved a fair housing agency that learned of a particular apartment complex's discriminatory actions in steering away Black applicants for housing. So, in response, that fair housing agency sent testers to the complex to uncover and build evidence of that discrimination. And that fair housing agency, Fair Housing, performed its work and did fair housing work throughout the entire Richmond metropolitan area, and it conducted testing as part of its regular course of business. But it claimed that the specific injury in that case was because that apartment complex and its discriminatory actions were frustrating the mission to promote fair housing, and also that it had diverted resources in the form of sending testers out, and that diversion of resources took away from other activity of that fair housing organization. And the Supreme Court found that was sufficient to constitute a distinct and palpable injury. And to be clear, the Supreme Court's analysis in Havens was not an alternative to Article 3 standing, nor was it an expansion of Article 3 standing. It was simply an articulation of the criteria that a court should look to in assessing whether an organization has suffered distinct and palpable injury. And this is the same guidance to be used under Illinois standing law, and in fact, the very same approach that Illinois Supreme Court used in a separate case, they're looking at whether an organization has sufficiently pled associational standing, that is, standing on behalf of its members. So in that case, International Union of Operating Engineers versus IDES, a 2005 Illinois Supreme Court case, that court looked to U.S. Supreme Court guidance on associational standing, which is set forth in Washington State, Hunt versus Washington State, Apple. And then with that guidance, the Illinois Supreme Court applied the Illinois test. And so we do the same analysis here in applying Havens. We look to what has been pled in the complaint, and whether these plaintiff organizations have pled a frustration of mission and a diversion of resources that would provide this court with guidance. And so again, looking to the complaint, as I mentioned, Raise Your Hands activities are focused generally on projects that affect the quality of public education. And these projects and programs rely on adequate and equitable funding for public schools. And so in paragraph 19 of our complaint, we talk about their work around special education, school facilities, school privacy issues, proper school governance. But because the unlawful use of TIF pulls money away from the general tax base that could go to support schools, that significantly harms the ability of Raise Your Hand to support these types of programs. And so for close to 10 years now, Raise Your Hand has been compelled to divert resources into activities that try to address the inequities caused by TIF. And so in paragraphs 20 through 22 of the complaint, we identify those types of diverting activities, which includes working with parents and organizing a mail campaign to try to release unused TIF funds back into the general base to support schools, supporting parents through data collection and analysis and research and training about how TIF works, presenting testimony at school board meetings about funding inequities and how TIF contributes to those. And then specifically their work around Lincoln Yards and organizing meetings and working to educate parents on the potential impact. So because of these activities and being compelled to address the improper use of TIF, Raise Your Hand has had fewer resources to devote to its education-focused programming. And again, that's alleged in paragraph 24 of our complaint. Grassroots Collaborative, as I mentioned, generally focuses on education and training and organizing projects. They have a strong focus on helping working families and around equitable development around the city. So that's included a lot of support and education, workshops and training for community groups and campaigns like raising the minimum wage. But since at least 2013, Grassroots Collaborative became very clear that the improper use of TIF was undermining its ability to advance its mission on behalf of working families and communities throughout Chicago. And so it felt compelled to devote time and energy and resources to address these growing inequities. And examples of those are shared in paragraphs 13 through 15 of our complaint. And that includes drafting a public report, educating and supporting community groups on how to challenge TIF districts. And then in response to Lincoln Yards, activities like convening community meetings and preparing public comments. And they even organized a bus tour to take individuals to areas of the city that were truly blighted and desperately in need of TIF funds. And because of these activities to address TIF, Grassroots Collaborative has had fewer resources to devote to its other programs and their mission has been frustrating. And we allege that in paragraph 17. So these are strong, lengthy, well-supported records for each of the organizations to show how they meet a distinct and palpable injury under Havens. Havens is a clear and principled test, a clear and principled test. Courts have used it for nearly 40 years to evaluate a distinct and palpable injury. And in a wide range of cases in a variety of organizational plaintiffs. This includes voting rights organizations, senior citizen groups, immigrant right groups, disability right groups. And this has not resulted in the opening of the court stores to any group with a cause, nor has it eroded the ability of the federal courts to apply even stricter Article III standing requirements. The courts have been clear about what is required and what is not. Havens does not require the showing that the diversion of resources must be forced or involuntary. We know that we've seen that in just last year in Common Cause Indiana versus Lawson, the Seventh Circuit saying what matters is whether the organization's activities were undertaken because of a challenged law, not whether they are voluntarily incurred or not. And Havens does not require activity that that significantly falls outside of the core mission work of the organization. And again, the Seventh Circuit addressed this in Lawson, but again, the federal district court of the Northern District of Illinois just this year in Nava versus Department of Homeland Security affirmed that an organization can have standing even though that diversion of resources was devotion of more work to what they were already doing. The critical inquiry there being was it in in response to the alleged unlawful activity of the defendant. The plaintiff organizations here have pled facts that show how the city's improper use of TIF frustrates their mission, how it's distinct and palpable, and they've described the consequent diversion of resources and they've done this consistent with Havens and they've done this consistent with Illinois law. We believe that when the burdens are properly assigned and the facts are alleged in a favoring the plaintiffs and when Illinois standing law is applied liberally to support access to the courts, the complaint here more than adequately supports the standing of these organizations. And I'm happy to address any of your questions. I have just a couple. It seems to me you use the term a lot that the activities of the organizations are frustrated or it's frustrating. Isn't that more a matter of that they have to prioritize what they're doing and, you know, just give priority to one thing versus another? Justice Levin, that is accurate. And I think for any organization, there is a process of prioritizing work. But what the courts have consistently said, and there's a very good discussion of this in Lawson, the Common Cause Indiana versus Lawson Seventh Circuit decision. What's critical is whether the choice they made in terms of prioritizing work or diverting work was in response to the alleged unlawful activity. So here, because the allegations are that TIFF is not complying with the state statutory requirements and being used in a way that has a discriminatory impact, what organizations divert funds and prioritize activity in response to that unlawful administration? And courts have consistently said if the answer to that inquiry is that they have, then that that meets the requirement of frustration of mission. Are you familiar with the Food and Water Watch Inc. versus Vilsack case? Your Honor, I don't have that in front of me. I'm not familiar with it right off. OK, I'm not going to hold you to it then at this point. In terms of the relief that you're requesting, you're asking that the case be remanded. You never asked the court for leave to further amend your complaint, right? That's correct. And the trial court here dismissed the complaint with prejudice, not providing the parties here, obviously, an opportunity to amend. We believe there are sufficient allegations to support the findings. So we have asked for a reversal and remand. And I would just stress, given, again, the stage that we're at and with the pleadings interpreted in the light most favorable to the plaintiffs, I think that suffices as many facts come out during the discovery phase. And the city is fair game to probe facts during discovery. But at this pleading stage, we feel like we've pled sufficient facts. Certainly, if this court believes that it would be appropriate to remand with the ability to amend, we would certainly be open to that as well. Well, the dismissal, though, is on 216.1, right? 2619, that's correct. 2619.1. And I looked at the right through the record. I never saw any indication, whether it's verbally or in writing, that the plaintiffs ever asked for leave to amend the complaint. Is that correct? That's correct, Your Honor. And the reason for that is because Judge Cohen's order was with prejudice. We believe that it was largely based on a misinterpretation of Havens, that Havens simply doesn't apply to this case because it only applies to the Fair Housing Act. So with respect to the ability to replead to satisfy what we believe was a misunderstanding of Havens would seem futile. And given that Judge Cohen made that clear in his opinion, it's correct. We did not make a request for leave to amend. It seemed to me in reading the record here that the problem that Justice Cohen had with your complaint was that in the Havens case, they had to prove that concrete and demonstrable injury to the organization's activities with a consequent drain on the organization's resources. That's the language from Havens, that your allegations didn't meet up to that standard. How would you counter that? Yeah, Justice Leavitt, our response to that is we actually have pledged, and I think a review of the complaint indicates that there have been concrete, specific activities of the organizations that have been frustrated. Activities like educational programming for, for example, raising your hand for parents and for grassroots workshops and trainings that it conducts. These are concrete services that have been impaired because of the diversion of resources. We believe that those conclusions by Justice Cohen were reached by holding inferences and constrain well-plaid facts against us again, which in this case, the plaintiffs should have received the benefit of the doubt. If there was concern or confusion about what those activities involved, again, it should have been construed in favor of plaintiffs. That's all the questions I have. Justice Puchinski? Yes, Mr. Chivani, I know that Justice Lavin asked you if you asked for permission to amend your pleadings and you said no, you didn't ask for that. But I have this memory that in the transcript somewhere you said something like, oh, we could always amend the pleadings. I don't think that it's in your it's certainly not in your appeal and it doesn't seem to be in that transcript. And I was flying through my papers and I can't find it right now. You did say that you believe that you could amend your pleadings. Did you remember saying that? Justice Puchinski, I believe that's in reference to the transcript from the argument on the motions to dismiss. And during that argument, which was a very lengthy argument, I believe my co-counsel may have offered that, you know, with any sort of concerns about the sufficiency of the pleadings, the plaintiff organizations could replete or complete additional facts to elaborate on the types of activities that have been frustrated or the types of diversion activities. And I believe that's what you're referring to. That sounds right. I'm sorry, I can't find it fast enough, but that sounds right. That's right. So one of the challenges you have with this whole standing issue is trying to find a way to demonstrate that besides just making a decision to spend money on efforts to defeat this TIF, you've also your mission has also been hurt. And I'm taking it from the discussion that we just had about the discussion you had on providing the motion to dismiss that you believe that there is some way that you can do that if you are allowed to amend your pleadings. Is that a correct statement? We certainly would be happy to elaborate on the types of activities and the ways in which the mission has been frustrated for these organizations. Once the case gets dismissed, I'm sure you would. But the point of fact is that you did not ask for a leave to amend. It's not in your brief. You haven't raised it on appeal. So I question, you know, I think it's forfeited. Why would it not be forfeited? Yeah. And again, Justice Levin, I appreciate that. As as was mentioned, that was raised during the argument on the motion to dismiss in response to that, Judge Cohen dismissed with prejudice again, and we believe largely based on a misreading of Havens and how that applies. Given the the way that the dismissal order was written and Judge Cohen's belief that Havens did not apply because these were not Fair Housing Act claims, there was no requirement to ask for leave to amend. And it would have been futile because we do not have Fair Housing Act claims here. And we didn't believe we could satisfy what we believed was a misinterpretation of Havens. And I would just reiterate that that we've we've pled some very specific facts in the complaint, both with respect to the frustration of mission and the diversion of resources. And I would just refer to to the Greer decision where the Illinois Supreme Court says, you know, this is the benefit goes to the plaintiff here. This is a low barring the burdens on the defendant. And for that reason, disputes of outstanding are often more appropriate at the summary judgment stage when discovery has been taken and there's a chance to to probe into the facts and for plaintiffs to produce the evidence of how their mission has been frustrated and how the resources have been diverted. But we do believe that the complaint in the details that we've included meets that standard. Thank you very much. Thank you. And counsel for the city, Ms. Tischer. Good morning, your honors. May it please the court. Plaintiffs allege that in response to the city's administration of its TIF program, they spent time and money advocating for TIF reform at the expense of their other work. This is insufficient to establish standing and the circuit court properly dismissed to their complaint. This morning, I will explain that plaintiffs do not allege an injury to a legally cognizable interest under either Illinois law or the Havens diversion of resources theory. I will then explain that plaintiffs also cannot satisfy the causation and redressability requirements of standing. Plaintiffs allege that they suffered an injury based on their decision to devote resources to to divert resources from their other programs to advocate for TIF reform. But as we explained in our brief, that argument is foreclosed by Landmarks Preservation Council, in which the Illinois Supreme Court explained that an organization cannot obtain standing merely by defining its own organizational purposes and declaring itself interested in a particular issue, nor can a plaintiff bootstrap itself into standing merely by spending time and money advocating for a particular issue. But that is precisely what plaintiffs have done in this case. Through their broadly worded mission statements, they have declared themselves interested in such matters as TIF funding and in furtherance of their missions, they have dedicated resources to advocating for TIF reform. That those resources could have been spent on other programs or activities is a natural consequence of running a nonprofit organization, not an injury to that organization. To allow plaintiffs to have standing in this case would dilute, if not completely eviscerate the standing requirements because it would allow virtually any organization with an interest in a particular issue to bring suit to litigate that issue. And as the courts have cautioned, any group with a special bone, if any group with a special interest with a bona fide special interest could initiate such litigation, then there's no reason why any it is there's no reason to perceive that any individual citizen with the same bona fide special interest would not also be entitled to do so. For these same reasons, plaintiffs also cannot prevail under the Haven's diversion of resources theory. They allege nothing more than a mere setback to their abstract social interests rather than any impediment to or impairment to any of the core activities that they provide or any of the core any core services that they provide. And as the cases we cite in our brief make clear to an injury arises under Haven's. When a defendant defendant's conduct frustrates the organization's ability to provide its core services, such as registering individuals to vote, securing access to fair benefits for immigrants, or where the defendant denies the organization access to information that the organization needs to carry out its core activities, such as monitoring and reporting, sorry, monitoring and reporting violations of the law. And in all of these circumstances, the organizations it's necessary for the organizations to counteract the defendant's conduct in order to continue their work. On the other hand, where an advocacy organization merely makes the choice to focus its efforts on a particular issue in furtherance of its mission, of its mission, such as advocating against a particular law, as in this case, that is not an injury under Haven's, but a mere result, but a result of the organization's own budgetary choices. And allowing an organization to bring suit in such circumstances that the federal courts have warned would require courts to adjudicate issues of wide public significance more appropriate for the representative, the representative branches, and would convert the judicial process into nothing more than a vehicle for the vindication of the value interests of concerned bystanders. And in this case, plaintiffs attempted to achieve TIF reform through the local legislative process, but they were unsuccessful. They now attempt to use the courts to achieve their desired results. And while they may have experienced a setback to their missions, none of the city's actions has prevented plaintiffs from continuing with their other work, continuing to advocate for TIF reform or continuing to work towards any other equitable policy or, you know, achieving, working towards a quality public education in furtherance of these efforts. And the attempt to show that the resources that they've devoted to advocacy and education efforts creates an injury, that misses the point. While it's certainly possible that to counteract the conduct of the defendant that perceptively impaired the organization's activities or services, that an organization may undertake advocacy or education work. And it's certainly possible that organization might have to divert resources away from their other advocacy work or public education work. But what the injury, what Havens requires is an impediment to or impairment of the organization's activities. So where an organization is merely undertaking advocacy and education work in furtherance of its mission, such as by, as in this case, where they're advocating against a mission that they perceive to be in direct conflict with their mission, that's not an injury under Havens. And in addition, plaintiffs' argument that, which they make in their reply brief, that in the defendants, that an injury arises under Havens when the defendant's conduct is in conflict with the organization's mission statement, that that is sufficient to create an impediment to the plaintiff's ability to carry out its core activities or to provide some sort of services. And that is what plaintiffs argue in their brief, which is that it is not, it is not sufficient to establish standing, that there still must be some impediment to the plaintiff's ability to carry out its core activities or to provide some sort of services. And that is what plaintiffs have failed to demonstrate in this case. Therefore, they have no injury under either Illinois law or under the Havens diversion of resources theory. Beyond that, plaintiffs also cannot establish the causation and redressability requirements understanding as to their claim that the establishment of the Cortland-Tiff district will result in siphoning of tax revenue away from local taxing bodies, which will lead to a tax hike. That is merely speculative. Plaintiffs admit that not all Tiff districts generate incremental tax increases. And at the time plaintiffs filed their complaint, the Cortland-Tiff district had just been approved. And at this point, the Lincoln Yards development is in the very early stages of development. So there is no information as to whether or to what extent this district will generate any incremental tax revenue. And moreover, this harm is far too attenuated to support standing. Plaintiff's injury must be a direct result of the complained of conduct. But the city's actions here are linked to the alleged harm through a speculative chain of possibilities. So the Cortland-Tiff may result in incremental tax increases, which in turn may result in local taxing bodies not having enough tax revenue to meet their in a tax hike to the taxes of the general public. And likewise, plaintiffs claim that the city's decision to locate Tiff districts in predominantly white census tracts has a disparate impact on community, predominantly African-American and Hispanic communities. That is not fairly traceable to the city's actions. Plaintiffs admit that Tiff districts are located throughout this in all geographic areas of the city and illustrations of their complaint demonstrate a fairly even distribution throughout all areas of the city, that Tiff districts in predominantly white census tracts generate more incremental tax revenue than those located in predominantly African-American or Hispanic census tracts. As plaintiffs allege, that is not a result of the city's actions, but rather a result of developers choices and natural market forces. And for all these reasons, plaintiffs also cannot satisfy the redressability prong because a favorable decision for plaintiffs will not give them the relief they seek. And I'm happy to take any questions, your honors. No questions for me. I just like to know, I haven't spent a lot of time on it, but I'm wondering, did the Has the Chicago School Board or the Chicago Public School Board ever sued the city over its development of a Tiff district? Not that I'm aware of, your honor, but I can't say for certain at this point. The Forest Preserve District? Again, I'm not aware, your honor. The Metropolitan Water Reclamation District? Again, your honor, I'm not aware that there's been, if there's been... Chicago Public Libraries? I'm not aware, your honor. Chicago Public Building Commission? Not that I'm aware, your honor. And it would be fair to say that all of those agencies are affected by the application of the Tiff designations? Potentially, those local taxing bodies could be affected by the Tiff. It would also be fair to say that all those local taxing bodies are political bodies that have, over whom administrations have significant influence. Yes, your honor. I have to answer that. Let's just get to the standing question. Would you agree that it is unusual and in Illinois, it's not preferred for a case to be dismissed with prejudice? That in fact, that the courts have said that that should be used rarely? Well, your honor, that may be true. And I would like to return to opposing counsel's comment that this was a situation where they even indicated at the motion to dismiss hearing that while they sort of left open the possibility that they could amend their complaint, that they believed that the allegations in their complaint were fully supported the conclusion that they did have standing. And, and in today's argument as well, counsel has pointed out that they, while they could potentially elaborate on the specific, you know, ways that they have spended money or some of the elaborate on the allegations in their complaint, they do feel that amending their complaint would be futile because at this point, the issue is really whether, you know, the proper interpretation of the law under Havens or under Illinois law. So in this case, we feel that because, because of the extent of plaintiff's pleadings, the facts that they've alleged, they have laid out the entirety of their theory on why they should have standing in this case. And it just doesn't meet the requirements under Illinois law or under Havens. Okay. But my question was, do you agree that in Illinois, going back to Gaida in 2015 and before that, and since then Illinois courts have a policy of favoring granting leave to amend a plaintiff's complaints? Well, I'm not as precisely as familiar with those cases, your honor. I would not disagree with that. If that's what those cases say. Yes. I don't disagree with it either, but I, there's no such motion made in the, uh, in the trial record, it's not raised on appeal and I don't think it's our relief that's never been requested. Correct. Your honor. And, uh, as plaintiffs indicated, they, they did not seek any amendment to any leave to amend their complaint. Um, nor did they ask, uh, file any motion for reconsideration of the district courts, I'm sorry, the circuit court's decision. And again, they have not raised anything in their briefs on appeal here to suggest that there would be any additional facts that they could bring to their, their complaint that would demonstrate that they have, um, any activity that, um, the city's conduct in its administration of its TIF program would impair or impede any of their activities or core services, uh, simply what plaintiffs have alleged in this case is that they were unsuccessful in their efforts to advocate for TIF reform. They have these broad, they have very broad missions to achieve equitable policy, to advocate for, uh, quality public education that they have devoted or that they've made the choice to devote resources to this particular. Um, you know, to, to advocate for TIF funding rather than focusing on any other policies. That's just how organizations operate. That is what they do in this case. They, and nothing that the city has done in this case has prevented them from continuing to work towards TIF reform or to work towards any of the other, um, period policy or programs that they, um, are otherwise engaged in. It was, it was a budgetary choice on behalf of these organizations. Okay. Thank you very much. Uh, we'll hear a rebuttal from the appellate. Um, thank you, Justice Levin. Uh, a few things. Um, number one, I just, I want to clarify, um, that, uh, given Judge Cohen's order, the only way we could have amended to satisfy his conclusion would have been to add the Fair Housing Act claim. Uh, Justice Cohen believed that Havens only applied to the Fair Housing Act. It, there was no way for us to amend, uh, to address that concern. So I, I want to stress that point. I do want to, um, just speak briefly to the Landmarks Preservation Council versus Chicago case. Again, as we've set out in our brief, this case is simply not on point and certainly doesn't control here. This was a case in which the, uh, Illinois Supreme Court itself, uh, stated in the opinion, the only interest of the plaintiff appears to be the ability to view an historic property from a public street. Uh, the plaintiff in that case did not plead frustration of mission and diversion of resources. The court did not apply Havens and the court was well aware of Havens, uh, and, uh, Landmarks was decided in September of 1988. In May of 1988, the Illinois Supreme Court decided Greer and in Greer relied on Havens in identifying, uh, the Illinois standards and specifically on the distinct and palpable injury element. So that the court was very well aware of Havens, that was simply a different type of injury pled by a plaintiff. It doesn't apply here. Uh, with respect to whether, um, the injuries can be traced to the defendant here and this question of whether they are speculative, I just want to point out, and this is what we've pled in the complaint, these are not speculative injuries, but have actually occurred. So on April 10th, uh, in 2019, when city council approved the creation of this property, uh, it was estimated to be worth $2.5 billion for Sterling Bay. That was the initial payment that was approved on that date. So that money is obligated, uh, as of now, uh, regardless of what happens with Lincoln Yarns. Uh, but the city also itself concluded, uh, in its analysis that they expected a 28 fold increase in property values over 23 years. So that's from property values of 87 million up to 2.5 billion. That was the city's own projections. And we've pled all of this in the complaint. We've pled about previous historic reports by, uh, uh, previously commissioner, uh, Mike Quigley, when he did his study about the improper use of TIF and how it, how it, uh, burdens, uh, other taxpayers because it, it pulls and diverts money from, uh, from taxing bodies. We we've cited other reports. So this is far from speculative. We have very specific facts that support the direct causation here. And then finally, I just briefly want to address the point that, uh, this, this, this whole complaint is because, uh, we have organizations that are just frustrated because their advocacy efforts didn't work. This is not the case of, uh, advocacy groups disagreeing on policy or strategy with respect to the city program. This complaint alleges specific violations of the law. It alleges that Lincoln Yards was created when it did not comply under the state statute. And it alleges with factual support, the kind of discriminatory impact, uh, over time that this program has had on African American and Latinx communities in Chicago. These are specific allegations of wrongdoing and unlawful conduct. This is not a complaint that is simply the continuation of a policy dispute. And Havens is clear that when, uh, uh, an organization's actions are taken in response to that type of illegal activity, that constitutes a diversion of resources, if it also frustrates the organization's missions, that's what we have pled here. We believe it more than sufficiently satisfies the pleading standards under Illinois law and the guidance under Haven. And we would ask this court to reverse the decision of the trial court and remand this case and allow these groups to present their case on the merits. Okay. I'd like to thank the parties for your briefs and your arguments. It's a rather, uh, interesting legal issue that you presented and it was presented well by both sides. Uh, and just another reminder of the justice cops will review the, uh, oral argument via zoom. And, uh, consider all of the briefs and we will get back to you directly with an opinion. Okay. Thank you. We are adjourned. Thank you.